THOMAS P. QUINN, JR., SBN : 132268
NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
Tel: (949) 376-3055
Fax: (949) 376-3070
Email:  tquinn@nokesquinn.com

Attorneys for Defendants EQUIFAX
INFORMATION SERVICES LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| NOEMIA CARVALHO, on behalf of herself and other similarly situated people,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT CONSULTING SERVICES, INC., dba CCS, EQUIFAX CREDIT INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION LLC and DOES 1-50, inclusive,<br><br>Defendants. | Case No.  5:08-CV-01317-JF<br><br><br>**RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**<br><br>**Hearing: June 20, 2008**<br>**Time:  9:00 a.m.**<br>**Judge: Jeremy Fogel**<br>**Courtroom 3, 5th Floor**<br>**Place: San Jose** |

COMES NOW Defendant Equifax Information Services LLC ("Equifax"), incorrectly sued herein as "Equifax Credit Information Services LLC," and submits its response in opposition to Plaintiff's Motion to Remand.  As discussed below, the motion should be denied.

## INTRODUCTION

On March 7, 2008, Equifax removed this case to this Court pursuant to the Class Action Fairness Act of 2005 ("CAFA").  Plaintiff now moves the Court to remand on the grounds that the matter in controversy does not exceed $5 million as required by CAFA.  Plaintiff claims no other deficiency in the removal.  As Equifax stated in its Notice of Removal, and again herein,

5100023

- 1 –

Plaintiff's recent deposition testimony proves the amount in controversy. She testified that her damages, and the damages of each class member, may exceed $25,000 each. She alleges that there are two classes of at least 500 potential class members each. It is without question, based on simple math, that the amount in controversy exceeds $5 million.

## STATEMENT OF FACTS

### A. Plaintiff's Complaint

On July 24, 2006, Plaintiff filed this case as a proposed class action in the Superior Court of California, Monterey County. *See* Exhibit A to Notice of Removal. The Complaint alleges that Equifax and the co-defendant consumer reporting agencies, Trans Union LLC and Experian Information Solutions Inc., violated the California Consumer Credit Reporting Act ("CCCRA"), California Civil Code sections 1785.1, *et. seq*. by reporting an inaccurate medical debt and failing to remove it upon her dispute. *See* Complaint, ¶¶ 1, 7-9. Ms. Carvalho asserts that class action treatment is appropriate for her claims and seeks to represent all California consumers for whom the CRAs failed to properly reinvestigate a dispute and failed to allow for review and consideration of all relevant information provided by the consumers. *Id.*, ¶ 13. A second alleged class is defined as all consumers who did not receive a description of the reinvestigation procedures. *Id.*, ¶ 14. Plaintiff contends that membership in each class exceeds 500 people. *Id.*, ¶ 18A.

Plaintiff contends that all members of the purported class have suffered injury, or are threatened with injury. *Id.*, ¶ 18C. She alleges that she will incur fees and costs in prosecuting the case. *Id.*, ¶ 19. She seeks damages, punitive damages, attorney's fees and costs on behalf of herself and members of the class. *Id.*, ¶¶ 22, Prayer for Relief. Plaintiff indicated on the Civil Case Cover Sheet that it is an "unlimited" case, indicating that the amount demanded exceeds $25,000.

The Complaint contains no ad damnum clause. The Complaint states no specific amount of damages sought by either Plaintiff or the putative class members whose interests she purports to represent. To date, Plaintiff has refused to provide a statement of her alleged damages.

5100023

- 2 –

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

1  Indeed, Plaintiff does not even state in her Motion that her claims are limited to an amount under
2  $5 million and she does not state the amount of damages she seeks for the putative class.

3  **B. Plaintiff's Deposition**

4  Equifax and the co-defendants deposed Plaintiff on February 6, 2008 and March 4, 2008.
5  Prior to those depositions, Plaintiff had not provided the defendants with any testimony or
6  information regarding damages for the putative class. At the deposition, Ms. Carvalho explained
7  that she incurred economic damages when she was unable to refinance a mortgage. Deposition of
8  Noemia Carvalho, Volume II, 264:7-22 (relevant portions attached hereto as Exhibit A). She
9  does not know specifically how much monetary damage Equifax allegedly caused her. *Id.*,
10 264:7-266:12.

11     Q. How much have you been damaged in your pocketbook because of Equifax?
12     A. I could not refinance my --my biggest damage is my refinance for my mortgage?
13     Q. Have you calculated how much damage that was in your refinance?
14     A. No, I did not calculate yet.

15 *Id.*, 264:9-13. Yet, she wrote to Equifax (and each of the other consumer reporting agency
16 defendants) before she filed her lawsuit and demanded $25,000 plus her attorneys fees, each to
17 resolve her individual claim. *Id.,* 242:23-243:16; 330:16-333:16; 334: 20-336:2.

18     Q. So at the time in February of 2006, this letter shows that your damages were $25,000
19     plus your attorney's fees?
20                   *(Objection excised)*
21     A. Yes, correct.

22 *Id.*, 335:18-336:2.

23 Plaintiff testified that members of the purported class may have damages that were more
24 than hers and some may have made demands to Equifax in excess of $25,000 to cover their
25 alleged damages. *Id.*, 333:17-334:14; 336:5-21; 340:24-341:9.

26     Q. Any of these people that are similarly situated to you, do you know if they made
27     demands to Equifax for settlement?
28     A. I don't know.

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

5100023                          - 3 –

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

1    Q. Do you know what their damages are?
2    A. I don't know.
3    Q. Their damages could be more than yours; right?
4    A. I don't know. Every case is a case; right?
5    Q. I'm asking about the people that are similarly situated to you.
6    A. Every case is different than each other.
7    Q.  Okay. So some of their damages might be more than yours; right?
8    A. Could be.
9    Q. Some of them could be less; right?
10   A. Right.
11   Q. Some of them could have made a $25,000 demand; right?
12   A. Yes.
13   Q. Some of them could have made a --
14   A.  Nothing.
15   Q. -- higher demand for settlement; right?
16   A.  Yes.
17   *Id.,* 333:17-334:14.
18   Q. Going back to the similarly situated question, again, in February 2006, you don't know
19   if anyone that was similarly situated had more than $25,000 in damages?
20   A. No.
21   Q. They could though; right?
22   A. I don't know. I don't know who.
23   Q. You don't know who, but they could, these people have more than $25,000 in
24   damages; right?
25                          *(Objection excised)*
26   A. Yes.
27   Q. And they could have more attorney's fees than you did too; right?
28   A. Yes, logically.

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

5100023                                - 4 –

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

1  *Id.,* 336:5-19.

2  Plaintiff testified that "$25,000 would not be enough" to resolve her damages or the
3  damages to each the persons in the purported class. *Id.,* 337:17-340:22.

4  Q. Would you agree to take $25,000 from Equifax now to resolve this case?
5  A. No.
6  *(Objection excised)*
7  Q. Would you take $50,000 from Equifax?
8  A. No.
9  ***
10 Q. How about on behalf of the persons whom you purport to represent? Would you take
11 $25,000 on each of those persons that you claim is similarly situated?
12 *(Objection excised)*
13 A: No.
14 Q. Is that not enough?
15 A. No. I'm not prepared to talk about money. This is not what I'm here for.
16 Q. I just want to make sure the record is clear. Even $25,000 apiece would not be enough
17 -- Even $25,000 apiece would not be enough for you to settle -- to resolve the damages on
18 behalf of the persons that are similarly situated?
19 *(Objection excised)*
20 A. That's correct.
21 Q. Do you know anything about the persons that are similarly situated with regard to
22 their damages?
23 A. No, I don't know anything.
24 *(Objection excised)*
25 Q. Again, their damages could be a lot more than yours, right?
26 *(Objection excised)*
27 A. That's correct.
28 *Id.,* 338:24-339:5; 340:2-341: 9.

5100023                              - 5 –

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

**ARGUMENT AND CITATION TO AUTHORITY**

**I.   THE REMOVAL OF THIS ACTION WAS PROPER UNDER CAFA.**

To satisfy the requirements for original jurisdiction under CAFA, the removing defendant must establish that the case: (1) meets CAFA's definition of "class action"; (2) contains 100 or more members in the putative class; (3) satisfies the requirement for minimal diversity; and (4) has an amount in controversy exceeding the sum or value of $5,000,000 in the aggregate, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d). Plaintiff does not dispute that Equifax has satisfied the numerosity or minimal diversity requirements. Nor does she contend that any of the exceptions to jurisdiction under CAFA apply. The only issue for the Court is whether there is $5 million in controversy. Plainly, Plaintiff's testimony and Complaint allegations establish the requisite amount in controversy.

    **A.   It Is More Likely Than Not That The Amount In Controversy Exceeds $5 Million.**

Plaintiff's Complaint did not plead a specific amount of damages. As such, Equifax's burden must simply prove "by a preponderance of the evidence" that the amount in controversy exceeds the jurisdictional minimum. *Abrego Abrego v. Dow Chemical Co.,* 443 F. 3d 676, 683 (9th Cir. 2006) (per curiam); *Sanchez v. Monumental Life Ins. Co.,* 102 F. 3d 398, 404 (9th Cir. 1996).

The preponderance standard is said not to be "daunting," as courts recognize that the removing defendant is not obligated to research, state, and prove the plaintiff's claims for damages. *Korn v. Polo Ralph Lauren Corp.,* 536 F. Supp. 2d 1199, 1204-1205 (E.D. Cal. 2008). In *Abrego Abrego,* the Ninth Circuit held that a court may consider facts in the removal petition and "summary-judgment-type" evidence relevant to the amount in controversy at the time of removal. 443 F. 3d at 690 (quoting *Singer v. State Farm Mutual Ins. Co,* 116 F.3d 373, 376 (9th Cir. 1997)).

Plaintiff's deposition testimony plainly establishes the $5 million CAFA threshold. She first testified that she would not settle her individual case with Equifax for $25,000 or even

5100023                                          - 6 –

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

1  $50,000. Carvalho Dep. II, 338:24-339:5. She then testified that she would not accept $25,000
2  for each of the putative class members:
3      Q. How about on behalf of the persons whom you purport to represent? Would you take
4      $25,000 on each of those persons that you claim is similarly situated?
5                                              (*Objection excised*)
6      A. No.
7                                                ***
8      Q. Even $25,000 a piece would not be enough for you to settle -- to resolve the damages
9      on behalf of the persons that are similarly situated?
10                                             (*Objection excised*)
11     A. That's correct.
12 *Id.,* 340:2-22.

13     The math is straightforward based on Plaintiff's testimony and her Complaint. First, Plaintiff's testimony that she would not resolve the claims of the putative class member for $25,000 each puts $25,000 in controversy for each putative class member. Second, her Complaint proposed two classes "in excess of 500" members each. Complaint, ¶ 184. Therefore, the amount in controversy based on Plaintiff's allegations and sworn testimony is $25,000,000, or the product of $25,000 and at least 1,000 putative class members. Even if the two proposed classes completely overlapped with one another such that there were only 500 putative class members, the minimum amount in controversy would still be $12,500,000, which is well beyond the $5,000,000 threshold.

    Courts in this Circuit consistently deny remand motions where the defendant satisfies the relatively light preponderance standard in demonstrating the minimum amount in controversy under CAFA. *See, e.g., Helm v. Alderwoods Group, Inc.,* 2006 WL 2002511 (N.D. Cal. May 7, 2008); *Bryant v. Service Corp. Int'l,* 2008 WL 2002515 (N.D. Cal. May 7, 2008); *Saulic v. Symantec Corp.,* 2007 WL 5074883 (C.D. Cal. Dec. 26, 2007). There can be little debate here that it is more likely than not that the amount in controversy exceeds $5,000,000.

28 //

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

5100023
- 7 –

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

### B. There Is No Requirement That Plaintiff's Individual Claims Exceed $75,000

Plaintiff claims that Equifax is required to prove that Plaintiff's individual claim meets the $75,000 threshold under 28 USC § 1332(a). Motion to Remand at 3. Plaintiff is incorrect. Plaintiff's argument is based on a complete misreading of *Abrego Abrego* and the context in which that case arose. While that case was removed under CAFA, it was not a proposed "class action" as defined by CAFA, but instead was a proposed "mass action" under the statute. *Abrego Abrego,* 443 F.3d at 677*; See also* 28 U.S.C. §1332(d)(11)(B). A "mass action" under CAFA requires each plaintiff to satisfy the $75,000 amount in controversy threshold. *See* 28 U.S.C. §1332(d)(11)(B)(i). That requirement is not imposed on "class actions" under CAFA. *See Nelson v. BIC USA, Inc.,* 2008 WL 906049 at n-2 (S.D. Cal. Apr. 1, 2008) (explaining this distinction and denying remand motion).

Here, Plaintiff's case is a proposed "class action" under CAFA. As such, there is no requirement that the claims of Plaintiff or any putative class member exceed $75,000. Plaintiff's arguments otherwise should be rejected.

## II.   EQUIFAX'S NOTICE OF REMOVAL WAS TIMELY.

Equifax's removal is timely because the amount in controversy was not asserted until Plaintiff testified in her depositions on February 6, 2008 and March 4, 2008 that her claims *and* the claims of each putative class member exceeded $25,000. Plaintiff's Complaint did not assert an amount of damages and thus the amount of controversy was not established by the filing, meaning that "the case stated by the initial pleading [was] not removable." 28 U.S.C. § 1446(b). Plaintiff did not previously provide any evidence in earlier discovery to support removal grounds. A notice of removal is timely if it is "filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, or other paper from which it may be first ascertained that the case is one which is or has become removable." *Id.*; *see also Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251-54 (9th Cir. 2006) (removal within 30 days of plaintiff's responses to interrogatories, which disclosed basis for removal for first time, was timely); *Riggs v. Continental Baking Co.*, 678 F. Supp. 236, 238 (N.D. Cal. 1988) ("Defendants did not receive notice under Section 1446(b) of the facts indicating removability

5100023

- 8 –

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

1  until plaintiff was deposed on September 30, 1987. The deposition constituted an 'other paper'
2  under the [removal] statute."). As in *Riggs*, Plaintiff's deposition testimony constituted "other
3  paper."

4  Further, the Ninth Circuit in *Abrego Abrego* and *Durham* announced states a general rule
5  that premature removal should be discouraged. The Court in *Abrego Abrego* cautioned against
6  premature removal of actions based on CAFA. CAFA makes federal jurisdiction dependent on
7  the nature of the claims and plaintiffs, which may only become clear following a detailed factual
8  inquiry. *Abrego Abrego* 443 F. 3d at 691-92. Likewise, in *Durham*, the Court that a defendant
9  removing prematurely "may well have subjected itself to fees and costs, and potentially Rule 11
10 sanctions, for filing a baseless removal." 445 F. 3d at 1251 (reversing remand).

11 Put simply, Equifax did not remove the case under CAFA earlier because the amount in
12 controversy was not apparent on the face of the Complaint and it was not until the Plaintiff's
13 deposition that the amount of the damages she is seeking on behalf of the class became evident.
14 CAFA requires that the claims of the individual class members are proposed aggregated to
15 exceed $5 million. Equifax did not have that information until Plaintiff's deposition.

16 **III.   PLAINTIFF'S REQUEST FOR SANCTIONS IS UNSUPPORTED.**

17 Plaintiff's request for sanctions and her allegation of a violation of Rule 11 are ludicrous.
18 Equifax did not misrepresent any evidence, as Plaintiff claims. In fact, her counsel attached to his
19 declaration the very pages from her deposition on which Plaintiff testified that "even $25,000
20 apiece would not be enough for [her] to settle -- to resolve the damages on behalf of the persons
21 that are similarly situated." Equifax's removal was proper and supported by the record. No such
22 sanction is warranted and Plaintiff's request for attorney's fees and costs should be denied.

23 **CONCLUSION**

24 Plaintiff's tactic is fairly obvious. She wants to move forward with an unlimited amount
25 in controversy but not in this Court. If Plaintiff seriously believes that her claim is limited to
26 under the jurisdictional amount, why doesn't she say so? This Court should retain jurisdiction.
27 Plaintiff's deposition testimony establishes, for the first time, that she may claim as much as
28 $25,000 damages for each of the 1000 class members (2 classes of 500 members), totaling

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

5100023                                                      - 9 –

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

$25,000,000. Further, that amount does not include Plaintiff's claim for attorney's fees and punitive damages. Equifax has met its burden of showing more likely than not that the amount in controversy exceeds $5,000,000. Plaintiff's motion to remand is without merit and should be denied.

                                       NOKES & QUINN

Dated: May 30, 2008                    /S/ THOMAS P. QUINN, JR.
                                       THOMAS P. QUINN, JR.

                                       BARRY GOHEEN
                                       LEWIS P. PERLING
                                       KING & SPALDING LLP

                                       Attorneys for Defendant EQUIFAX
                                       INFORMATION SERVICES, LLC

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

5100023                                - 10 –

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

# CERTIFICATE OF SERVICE

CARVALHO v DEFENDANT EQUIFAX, et al, CASE NO: 5:08-CV-01317-JF

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Orange, State of California, and not a party to the above-entitled cause.

On May 30, 2008. I served a true copy of the

**RESPOSNE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

[ ]     By personally delivering it to the persons(s) indicated below in the manner as provided in FRCivP5(B);

[ ]     By depositing it in the United States Mail in a sealed envelope with the postage thereon fully prepaid to the following;

[X]     By ECF: On this date, I electronically filed the following document(s) with the Clerk of the Court using the CM/ECF system, which sent electronic notification of such filing to all other parties appearing on the docket sheet;

> Ron Keith Bochner
> Law Office of Ron Bochner
> 3333 Bowers Avenue, Suite 130
> Santa Clara, CA  95054
>
> Deanna L. Johnston
> Kelli A. Crouch
> Jones Day
> 555 California Street, 26th Floor
> San Francisco, CA  94104-1500
>
> Stephen Julian Newman
> Brian C. Frontino
> Strook & Strook
> 2029 Century Park East
> Los Angeles, CA  90067

I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

I hereby certify under the penalty of perjury that the foregoing is true and correct.

/S/ YVONNE M. HOMAN
YVONNE M. HOMAN

NOKES & QUINN
450 Ocean Avenue
Laguna Beach, CA 92651
(949) 376-3055

5100023                           - 11 –

RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND



IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF MONTEREY

NOEMIA CARVALHO, on behalf of herself and other similar people,
        Plaintiff,
vs.                                No. M90093
CREDIT CONSULTING SERVICES, INC., dba CCS, et al.,
        Defendants.

DEPOSITION OF NOEMIA CARVALHO
San Francisco, California
Tuesday, March 4, 2008
Volume 2

REPORTED BY:
LYNNE LEDANOIS
CSR No. 6811
Job No. 83261

APPEARANCE OF COUNSEL:

For Plaintiff:
  LAW OFFICES OF RON BOCHNER
  BY: RON BOCHNER
  Attorney at Law
  3333 Bowers Avenue, Suite 130
  Santa Clara, California 95054
  408.200.9890
  robolaw@justice.com

For Defendant Experian:
  JONES DAY
  BY: DEANNA L. JOHNSTON
  Attorney at Law
  555 California Street, 26th Floor
  San Francisco, California 94104-1500
  415.626.3939
  dljohnston@jonesday.com

For Defendant Equifax:
  KING & SPALDING
  BY: LEWIS PERLING
  Attorney at Law
  1180 Peachtree Street, N.E.
  Atlanta, Georgia 30309-3521
  404.572.4618
  lperling@kslaw.com

For Defendant TransUnion:
  STROOCK & STROOCK & LAVAN LLP
  BY: BRIAN C. FRONTINO
  Attorney at Law
  2029 Century Park East
  Los Angeles, California 90067-3086
  310.556.5800
  bfrontino@stroock.com

Page 217 / Page 219

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF MONTEREY

NOEMIA CARVALHO, on behalf of herself and other similar people,
        Plaintiff,
vs.                                No. M90093
CREDIT CONSULTING SERVICES, INC., dba CCS, et al.,
        Defendants.

Deposition of NOEMIA CARVALHO, taken on behalf of Defendant, at 555 California Street, 25th Floor, San Francisco, California, beginning at 10:01 a.m. and ending at 4:20 p.m. on Tuesday, March 4, 2008, before LYNNE LEDANOIS, CSR 6811.

VIDEOGRAPHER:
  SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
  BY: CASSIA LEET

Page 218 / Page 220

**Page 241**

1  please.
2        (Defendant's Exhibit 43 was marked for
3        identification by the Court Reporter.)
4  BY MS. JOHNSTON:
5     Q  Ms. Carvalho, have you ever seen Exhibit Number
6  43?
7     A  No, I've never seen this document.
8     Q  Did Ms. Hong ever tell you that you were denied
9  a loan because your combined loan-to-value ratio was
10 considered to be too high?
11       MR. BOCHNER:  Calls for speculation, vague and
12 ambiguous.
13       THE WITNESS:  This over here was not to combine
14 a loan.
15       MR. BOCHNER:  Could you restate your question,
16 please?
17       MS. JOHNSTON:  Sure.
18 BY MS. JOHNSTON:
19    Q  Ms. Carvalho, my question is, did Ms. Hong ever
20 tell you that the combined loan-to-value ratio that you
21 were seeking was the cause of you being denied any type
22 of credit?
23       MR. BOCHNER:  Same objections.
24       THE WITNESS:  No, she never said anything to
25 me.

**Page 242**

1  BY MS. JOHNSTON:
2     Q  Did Ms. Hong ever tell you that you had been
3  denied credit because the months of reserve that you had
4  were inadequate?
5        MR. BOCHNER:  Vague and ambiguous, calls for
6  speculation.
7        THE WITNESS:  No.
8  BY MS. JOHNSTON:
9     Q  Did Ms. Hong ever tell you that you were denied
10 a loan because the property type was not considered
11 desirable; it was considered a risk?
12       MR. BOCHNER:  Vague and ambiguous, calls for
13 speculation.
14       THE WITNESS:  No.
15 BY MS. JOHNSTON:
16    Q  Did Ms. Hong ever tell you that the total
17 expense ratio-to-income was too high and that that was a
18 basis for denying you credit?
19       MR. BOCHNER:  Vague and ambiguous, calls for
20 speculation, asked and answered.
21       THE WITNESS:  No.
22 BY MS. JOHNSTON:
23    Q  Ms. Carvalho, if I could have you take a look
24 at Exhibit 30.  It was a document that we talked about
25 during your last deposition, a letter dated February 9,

**Page 243**

1  2006 from Mr. Bochner to Experian.
2        MR. BOCHNER:  I object, that this is a
3  settlement document.
4  BY MS. JOHNSTON:
5     Q  At the bottom of the page, in the last
6  paragraph on the first page, the last full sentence, it
7  says, Therefore, Ms. Carvalho is demanding that, one,
8  this entry be removed from her credit report, and, two,
9  she be paid $25,000 plus attorney's fees to compensate
10 for her damages.
11       Ms. Carvalho, as you sit here today, would you
12 be willing to accept $25,000 as settlement of this case?
13       MR. BOCHNER:  These questions were asked and
14 answered, are harassing.  They are improper to a class
15 representative.
16       THE WITNESS:  No, I'm not accept no money.
17       MR. BOCHNER:  That's...
18 BY MS. JOHNSTON:
19    Q  I appreciate the fact that you said you don't
20 want to accept any money as a deal for this case.
21       I have a slightly different question, which is,
22 do you -- can you provide me a specific amount that you
23 believe you have been damaged as a result of Experian's
24 actions in connection with this case?
25       MR. BOCHNER:  It's an improper question to a

**Page 244**

1  class representative.
2        But go ahead, if you --
3        THE WITNESS:  I'm not ready -- I told you
4  before, I'm not here to discuss about the amount of
5  money.
6        MR. BOCHNER:  It's also asking for a legal
7  conclusion.
8        MR. PERLING:  Ron, I cannot hear you.  I'm
9  sorry.
10       MR. BOCHNER:  I said it also asks for a legal
11 conclusion.
12       THE WITNESS:  I'm here because the damage --
13       MR. BOCHNER:  You can answer that question yes
14 or no.
15       THE WITNESS:  -- has been caused already and
16 took too long for all the lawyers and everybody to pay
17 attention to this case.  And it has been already almost
18 seven years.
19       So money or no money is not going to help me
20 now.  The only thing that I want to know is why it took
21 too long for someone to sit down and look at my
22 documents and pay attention, that I should not pay $118
23 in the beginning of the case.
24       MR. BOCHNER:  I think you answered her
25 question.  All you have to do is answer her questions;

**Page 261**

1 in the first place. So, please, someone out there -- I
2 know that in your office has someone that has more
3 authority than collector companies, and calls them and
4 making them to not ruin my name the way they did.
5 BY MR. PERLING:
6    Q  You don't know what CCS did, do you?
7    A  No, I don't know.
8    Q  You don't know if Equifax ever contacted CCS,
9 do you?
10   A  I don't know.
11   Q  You don't know what contact, if any, they had
12 with CCS?
13   A  No. But I know that the -- in your company has
14 people that has authority to contact those collector
15 companies and make them to do the right thing. And they
16 don't -- and they did not do that.
17   Q  Now, the next thing -- backing up a little bit.
18      You said that you wanted your name cleared
19 seven years ago -- let me back up.
20      I asked you what it is that you wanted out of
21 the lawsuit. You told me you wanted your name cleared
22 seven years ago.
23      But you understand Equifax, obviously, cannot
24 go back in time; right?
25   A  That's correct.

**Page 262**

1    Q  And you understood that when you filed the
2 lawsuit?
3    A  I understand that.
4    Q  And you said you don't want this repeated to
5 anyone else because it can cause a lot of damage?
6    A  That's correct.
7    Q  What damage did Equifax cause you?
8       MR. BOCHNER: Objection, calls for a legal
9 conclusion.
10      THE WITNESS: My name has been damaged for
11 seven years for something that was -- in the first
12 place, I should not have my name damaged.
13 BY MR. PERLING:
14   Q  Okay.
15   A  This is the damage that I have.
16   Q  So your name is damaged. I understand.
17      When you say your name is damaged, what do you
18 mean by that?
19   A  My -- anything that I try to do now always
20 shows this bill that I never paid. And always people,
21 when I try to refinance, to do anything, they say, oh,
22 you did not pay this bill, so your credit is not good
23 because of that. Or did you not pay $118, so your
24 credit is not good because of that. This is not a good
25 skills.

**Page 263**

1    Q  How many times did someone see your Equifax
2 credit report where it had your name damaged?
3       MR. BOCHNER: Calls for speculation.
4       THE WITNESS: How many times people see?
5 BY MR. PERLING:
6    Q  Yes. Just your Equifax credit report.
7       MR. BOCHNER: Same objection.
8 BY MR. PERLING:
9    Q  Let me back up.
10      When you say your name is damaged, you mean
11 that Equifax told someone that you had a collection, and
12 that was a damage to your name; is that a fair summary?
13   A  That's correct.
14   Q  How many times did that occur that Equifax told
15 someone that?
16      MR. BOCHNER: Calls for speculation.
17      THE WITNESS: I don't know.
18 BY MR. PERLING:
19   Q  How are you damaged by Equifax doing that?
20      MR. BOCHNER: Calls for a legal conclusion,
21 vague and ambiguous as to "damaged."
22      THE WITNESS: I don't know what you want to go
23 through.
24 BY MR. PERLING:
25   Q  Have you been damaged in your pocketbook?

**Page 264**

1       MR. BOCHNER: Vague and ambiguous as to
2 "pocketbook."
3       THE WITNESS: Because of this?
4 BY MR. PERLING:
5    Q  Yes, ma'am.
6    A  Yes.
7    Q  How much have you been damaged in your
8 pocketbook because of Equifax?
9    A  I could not refinance my -- my biggest damage
10 is my refinance for my mortgage.
11   Q  Have you calculated how much damage that was in
12 your refinance?
13   A  No, I did not calculate yet.
14   Q  Was this the occasion we've already talked a
15 little bit about this morning with Exhibits 40 through
16 43?
17   A  I think so, yes.
18      MR. BOCHNER: Vague and ambiguous.
19 BY MR. PERLING:
20   Q  I'm sorry. I'm not sure I heard you.
21      You say you have not calculated an amount?
22   A  No.
23   Q  How would you calculate that?
24      MR. BOCHNER: Calls for speculation.
25      THE WITNESS: How I calculate it? I have to

```
 1  look for someone that understands about the calculations
 2  and sit down and calculate all the years, and then I can
 3  come up with some number.
 4  BY MR. PERLING:
 5     Q  When you say "calculate all the years," are you
 6  going to add up some numbers?
 7     A  I have to, right, for seven years.
 8     Q  What numbers are you going to add?
 9        MR. BOCHNER: Calls for speculation, calls for
10  a legal conclusion.
11        THE WITNESS: The very end of the interest that
12  I should have and I didn't have because of my name being
13  in collection.
14  BY MR. PERLING:
15     Q  Are you claiming you're paying more for your
16  mortgage now than you should be?
17     A  Yes.
18     Q  How much more are you claiming that you're
19  paying for your mortgage now than you should be?
20        MR. BOCHNER: We may need to take a break for a
21  second.
22        THE WITNESS: No, no, I cannot go through with
23  this just by heart.
24        MR. BOCHNER: Can we go off the record for just
25  one second?
                                               Page 265
```

```
 1  should be?
 2     A  No, because I was not buying anything that
 3  requests for me to pay in long-term. Only my mortgage
 4  is a long-term investment.
 5     Q  Have you been denied credit at any time because
 6  of Equifax reporting the collection?
 7        MR. BOCHNER: Calls for speculation, vague and
 8  ambiguous as to "denial of credit."
 9        THE WITNESS: No, I don't recall that I have
10  been denied credit.
11  BY MR. PERLING:
12     Q  Have you had any expenses or costs because of
13  what Equifax reported?
14        MR. BOCHNER: Vague and ambiguous.
15        THE WITNESS: I don't know.
16  BY MR. PERLING:
17     Q  Did you have to pay an attorney to contact
18  Equifax on your behalf?
19        MR. BOCHNER: Vague and ambiguous, calls for
20  attorney-client privileged material.
21        THE WITNESS: I'm not going to respond to this
22  question.
23  BY MR. PERLING:
24     Q  Why aren't you going to respond to my question?
25        MR. BOCHNER: Objection, attorney-client
                                               Page 267
```

```
 1        MR. PERLING: Not while there is a question
 2  pending.
 3        MR. BOCHNER: Go ahead.
 4        THE WITNESS: For me to talk about numbers, I
 5  have to have a calculation, I have to have someone that
 6  really understands the difference of how much I lost,
 7  how much I should not lose, and I cannot do this just by
 8  talking with you. For me, it's not possible.
 9  BY MR. PERLING:
10     Q  So you don't know how much more you're paying
11  than you should be?
12     A  No, I cannot go through this alone.
13        MR. PERLING: Ron, do you still need to take a
14  break?
15        MR. BOCHNER: The mortgage has been paid off.
16        MR. PERLING: Objection. You're testifying now
17  or the witness is testifying?
18        MR. BOCHNER: Go forward if you wish.
19        MR. PERLING: Thank you. My question was, do
20  you need to take a break? Because you asked for a
21  break.
22        MR. BOCHNER: No.
23  BY MR. PERLING:
24     Q  Have you been damaged in your pocketbook in any
25  other way other than the mortgage being higher than it
                                               Page 266
```

```
 1  privilege.
 2        MR. PERLING: Are you instructing the witness
 3  not to answer?
 4        MR. BOCHNER: No. I'm making an objection for
 5  the record.
 6        THE WITNESS: No, I did not receive
 7  instruction, but I'm not ready for those answers.
 8  BY MR. PERLING:
 9     Q  So you're refusing to answer my question of
10  whether or not you paid an attorney to contact Equifax
11  on your behalf; is that correct?
12     A  If I pay or not pay, what is going to make
13  better for me or not?
14     Q  That's not the question, ma'am.
15        The question is, are you going to refuse to
16  answer my question as to whether or not you --
17     A  Yes, I'm going to refuse.
18     Q  Okay. We started this line of questioning when
19  I asked you what it is you wanted out of this lawsuit,
20  and you told me you wanted your name cleared, and you
21  did not want this repeated to anyone else because it
22  caused people damage.
23        MR. BOCHNER: Asked and answered.
24  BY MR. PERLING:
25     Q  Have you spoken to anyone else which you claim
                                               Page 268
```

**Page 329**

Q Okay. We'll put that aside.
  Now, we've looked at two dispute letters so far from you -- or from your attorney on your behalf; correct?
A Yes.
Q And then there was -- one of those letters was a request for a description of the process and a consumer statement, so that was not a dispute.
  Of those three contacts, were those the only three contacts you had prior to June 3 of 2005 with Equifax?
A This was the only two, I think, that my lawyer did.
  MR. BOCHNER: It's vague and ambiguous.
BY MR. PERLING:
Q All the contacts were made through your attorney after your first dispute; correct?
A That's correct.
Q Were all of those in writing, to your knowledge?
A Yes.
Q Do you know if he ever contacted Equifax via telephone on your behalf?
A No, never called.
Q He never did?

**Page 330**

A This I don't know.
Q We would have to ask him if he ever called Equifax?
A Correct.
Q But you never called Equifax?
A No.
Q Did you ever get on Equifax's website and contact them through their website?
A No.
Q Do you know if he ever contacted them through their website?
A No.
  (Defendant's Exhibit 51 was marked for identification by the Court Reporter.)
BY MR. PERLING:
Q Let me show you the next exhibit, which is Equifax's copy of the February 9, 2006 letter, EIS --
  MR. BOCHNER: I'll object that this is a settlement document.
  MR. PERLING: -- EIS 71 through 75.
  We'll agree to keep this document confidential pursuant to the confidentiality order to the extent it contains any information regarding settlement.
  MR. BOCHNER: I'm still making my objection.
BY MR. PERLING:

**Page 331**

Q I think you've seen other copies of this letter so far.
  Do you recognize this letter?
A My lawyer typed this letter.
Q Do you know why while the prior disputes he wrote were under your name and your address with him signing your signature, now in February of '06 he was now sending them on his letterhead with his signature? Do you know why that is?
A No, I don't know the procedure.
Q We would need to ask him why that was?
A That's correct.
Q But you hired your attorney well prior to February 9 of 2006; correct?
  MR. BOCHNER: Asked and answered.
BY MR. PERLING:
Q You can still answer.
A Prior.
Q Well prior to that?
A Yes.
  MR. BOCHNER: Asked and answered.
BY MR. PERLING:
Q There's some numbers at the top of the page.
  That is not your handwriting, is it?
A M-hm. No.

**Page 332**

  MR. BOCHNER: Which numbers are you referring to?
  MR. PERLING: Handwritten numbers. Excuse me.
  THE WITNESS: No, that's not my writing.
BY MR. PERLING:
Q Why were you disputing again in February 2006?
  MR. BOCHNER: The document speaks for itself.
  THE WITNESS: My lawyer decide to do. He decided to continue in the case.
BY MR. PERLING:
Q So you don't know why there was no dispute between July of '05 and February of '06?
A No, I don't.
Q That $25,000 number which is on the last line, did you come up with that number?
A No, I didn't.
  MR. BOCHNER: I'll object, settlement document, settlement offer.
BY MR. PERLING:
Q That was to cover your damages at the time that this letter was written; correct?
A I don't know. I did not write numbers.
Q You don't know where that number came from?
A No.
Q Who would know? We would have to ask your

**Page 333**

1 attorney?
2   A  That's correct.
3   Q  Do you understand, however, that he was asking
4 for -- he was demanding -- you understand that he was
5 demanding money on your behalf?
6   A  No.
7   Q  You did not know that was going to happen?
8   A  No.
9   Q  Okay. Assuming, then, for the sake of argument
10 that that $25,000 was to cover your damages, did you
11 have $25,000 worth of damages in February of 2006?
12   A  I don't know.
13       MR. BOCHNER:  Calls for speculation.
14 BY MR. PERLING:
15   Q  You don't know?
16   A  I did not make this calculation.
17   Q  Any of these people that are similarly situated
18 to you, do you know if they made demands to Equifax for
19 settlement?
20   A  I don't know.
21   Q  Do you know what their damages are?
22   A  I don't know.
23   Q  Their damages could be more than yours; right?
24   A  I don't know. Every case is a case; right?
25   Q  I'm asking about the people that are similarly

**Page 334**

1 situated to you.
2   A  Every case is different than each other.
3   Q  Okay. So some of their damages might be more
4 than yours; right?
5   A  Could be.
6   Q  Some of them could be less; right?
7   A  Right.
8   Q  Some of them could have made a $25,000 demand;
9 right?
10   A  Yes.
11   Q  Some of them could have made a --
12   A  Nothing.
13   Q  -- higher demand for settlement; right?
14   A  Yes.
15   Q  Some of them could have made a lesser demand
16 for settlement; right?
17   A  Or nothing.
18   Q  Or nothing.
19   A  Right.
20   Q  Now, the second page asks plus attorney's fees
21 to compensate you for damages.
22   A  Yes.
23   Q  So the $25,000 was clearly to compensate you
24 for damages; right? That's what the document says?
25       MR. BOCHNER:  Calls for speculation.

**Page 335**

1 BY MR. PERLING:
2   Q  Is that right, ma'am?
3   A  I don't know anything about this letter.
4   Q  But you can --
5   A  I can't say anything positive or negative
6 about...
7   Q  But you can, in fact, read the letter; right?
8   A  I can read the letter. I did not type the
9 letter. I did not come up with this number. And my
10 lawyer is responsible for it.
11   Q  I understand. But the letter says that you're
12 demanding you be paid $25,000 plus attorney's fees to
13 compensate you for your damages --
14       MR. BOCHNER:  The letter speaks for itself.
15 BY MR. PERLING:
16   Q  -- right?
17   A  My lawyer.
18   Q  So at the time in February of 2006, this letter
19 shows that your damages were $25,000 plus your
20 attorney's fees?
21   A  He --
22       MR. BOCHNER:  Calls for a legal conclusion.
23       MR. PERLING:  I need a response from the
24 witness.
25 BY MR. PERLING:

**Page 336**

1   Q  Isn't that what the letter shows?
2   A  Yes, correct.
3       MR. BOCHNER:  Calls for a legal conclusion.
4 BY MR. PERLING:
5   Q  Going back to the similarly situated question,
6 again, in February 2006, you don't know if anyone that
7 was similarly situated had more than $25,000 in damages?
8   A  No.
9   Q  They could though; right?
10   A  I don't know. I don't know who.
11   Q  You don't know who, but they could, these
12 people --
13       MR. BOCHNER:  Calls for speculation.
14 BY MR. PERLING:
15   Q  -- have more than $25,000 in damages; right?
16   A  Yes.
17   Q  And they could have more attorney's fees than
18 you did too; right?
19   A  Yes, logically.
20   Q  You don't if any of them had attorneys?
21   A  That's right.
22   Q  Have you had any damages since February 9 of
23 2006?
24       MR. BOCHNER:  Calls for a legal conclusion,
25 calls for speculation.

30 (Pages 333 to 336)

```
 1       THE WITNESS: My damage has been made already.
 2   BY MR. PERLING:
 3    Q  So you have not had any additional damages
 4   since February 9 of 2006?
 5    A  No. I don't know what damages you're talking
 6   about. Damages for seven years. It's already enough;
 7   right?
 8       MR. BOCHNER: Well, seven years would include
 9   today, wouldn't it?
10       MR. PERLING: I object to the statements on the
11   record.
12   BY MR. PERLING:
13    Q  Ma'am, the letter says it was for -- to
14   compensate you for $25,000 worth of damages.
15       You have not had any -- strike that. I've
16   already asked that.
17       Well, I know that Experian already asked you
18   this question. Let me ask it for Equifax.
19       Would you agree to take $25,000 --
20       MR. BOCHNER: Same objections that we made
21   before. It's asked and answered.
22       MR. PERLING: Counsel, it is common courtesy to
23   let the question get on the record before you make your
24   objection.
25       MR. BOCHNER: So already said that it was
                                              Page 337
```

```
 1   asked, so I already know what the question is, and I'm
 2   making my objections.
 3       MR. PERLING: So you're saying it's okay to
 4   interrupt me when I'm asking a question?
 5       MR. BOCHNER: You said that it was the same
 6   question that had been asked by Experian before. And
 7   I'm objecting, asked and answered.
 8       MR. PERLING: Can I ask my question then?
 9       MR. BOCHNER: Yes.
10       MR. PERLING: Thank you.
11   BY MR. PERLING:
12    Q  Would you agree to take $25,000 from Equifax?
13    A  No.
14       MR. BOCHNER: Same objection that was made
15   before. It also violates professional ethics.
16       MR. PERLING: I have not even gotten the
17   question on the record yet. I've been interrupted now
18   twice in trying to ask the same question.
19       MR. BOCHNER: Well, you asked the same
20   question.
21       MR. PERLING: That's three times. Can I ask
22   the question?
23   BY MR. PERLING:
24    Q  Would you agree to take $25,000 from Equifax
25   now to resolve this case?
                                              Page 338
```

```
 1    A  No.
 2       MR. BOCHNER: Same objections.
 3   BY MR. PERLING:
 4    Q  Would you take $50,000 from Equifax?
 5    A  No.
 6    Q  How much would it take from Equifax to resolve
 7   the case today?
 8       MR. BOCHNER: This is unethical behavior. You
 9   cannot offer class representatives --
10       THE WITNESS: You cannot offer me anything. I
11   will not accept it.
12       MR. BOCHNER: Please be quiet while I talk.
13   Let me make this for the record.
14       MR. PERLING: Make your objection.
15       MR. BOCHNER: My objection is this is improper.
16   You cannot offer a class representative a settlement in
17   a case to defeat the class certification.
18       Go ahead and answer the question.
19       THE WITNESS: I will not accept any offer from
20   any of your companies.
21   BY MR. PERLING:
22    Q  Okay. There is no amount?
23    A  No amount. That's correct.
24       MR. BOCHNER: It's asked and answered. You're
25   badgering the witness.
                                              Page 339
```

```
 1   BY MR. PERLING:
 2    Q  How about on behalf of the persons whom you
 3   purport to represent? Would you take $25,000 on each of
 4   those persons that you claim is similarly situated?
 5       MR. BOCHNER: Asks for a legal conclusion,
 6   calls for speculation.
 7       THE WITNESS: No.
 8   BY MR. PERLING:
 9    Q  Is that not enough?
10    A  No. I'm not prepared to talk about money.
11   This is not what I'm here for.
12    Q  I just want to make sure the record is clear.
13       Even $25,000 apiece would not be enough --
14       MR. BOCHNER: Same objection.
15       MR. PERLING: Let me finish the question.
16   BY MR. PERLING:
17    Q  Even $25,000 apiece would not be enough for you
18   to settle -- to resolve the damages on behalf of the
19   persons that are similarly situated?
20       MR. BOCHNER: Calls for a legal conclusion,
21   same objections.
22       THE WITNESS: That's correct.
23   BY MR. PERLING:
24    Q  Do you know anything about the persons that are
25   similarly situated with regard to their damages?
                                              Page 340
```

```
 1     A  No, I don't know anything.
 2        MR. BOCHNER:  Asked and answered.
 3  BY MR. PERLING:
 4     Q  Again, their damages could be a lot more than
 5  yours --
 6        MR. BOCHNER:  Asked and answered.
 7  BY MR. PERLING:
 8     Q  -- right?
 9     A  That's correct.
10     Q  In February of 2006, you opened up a new
11  account -- credit card account with Washington Mutual.
12        Do you remember doing that, a credit card
13  account?
14        MR. BOCHNER:  Are you asking her or are you
15  telling her?
16        MR. PERLING:  I'm asking her if she remembers
17  that.
18        MR. BOCHNER:  Okay.
19        THE WITNESS:  Yes, I remember.
20  BY MR. PERLING:
21     Q  You didn't have any problems opening that
22  account, did you?
23     A  No, I don't.
24        MR. PERLING:  Let me push through and get
25  through some of these other documents.  I think I can
                                                  Page 341
```

```
 1  wrap up if we get these documents on the record.
 2        (Defendant's Exhibit 52 was marked for
 3         identification by the Court Reporter.)
 4  BY MR. PERLING:
 5     Q  Let me show you Exhibit Number 52, which is EIS
 6  Carvalho 126 and 127.  It's a March 16, 2006 letter.
 7  This letter is addressed to your attorney.
 8        Do you recall seeing this letter prior to
 9  today?
10     A  No.
11     Q  Do you know if he received it?
12     A  I think he received it.
13     Q  But do you know that?
14     A  No, I don't know.
15     Q  We would have to ask him that question?
16     A  Yes, correct.
17        MR. PERLING:  There's a copy that Equifax
18  received back, which I'll mark as 53.
19        (Defendant's Exhibit 53 was marked for
20         identification by the Court Reporter.)
21        THE WITNESS:  I think --
22        MR. PERLING:  This is EIS 128 and 129, 130.
23  BY MR. PERLING:
24     Q  Let me show you Exhibit Number 53.
25        As you can see, that's the March 16, 2006
                                                  Page 342
```

```
 1  letter with somebody having filled in the blanks.
 2        Did you -- is that your handwriting?
 3     A  That's correct.
 4     Q  You filled this in?
 5     A  Yes.
 6     Q  Did you then forward it back to Equifax?
 7        MR. BOCHNER:  Look at the second page.
 8        MR. PERLING:  Counsel, I'll ask you not to
 9  direct the witness --
10        THE WITNESS:  My lawyer send back.
11  BY MR. PERLING:
12     Q  You can tell that by looking at the second
13  page; right?
14     A  That's correct.
15     Q  Right.  And how do you know from looking at the
16  second page that your attorney sent it back and not you?
17     A  That's correct.
18     Q  How do you know that?
19     A  Because it has his address there and his -- the
20  stamp of the mail.  I don't live there.
21     Q  And it looks like he mailed it back on April
22  5th, 2006.  Do you see that as the postmark?
23     A  That's correct.
24     Q  Do you know why between March 16, '06 and April
25  5th, 2006 it took so long to fill that out?
                                                  Page 343
```

```
 1     A  I have no idea.
 2        (Defendant's Exhibit 54 was marked for
 3         identification by the Court Reporter.)
 4  BY MR. PERLING:
 5     Q  Let me show you Exhibit Number 54, which is EIS
 6  Carvalho 76 through 79.
 7        Do you recognize Exhibit Number 54?
 8     A  It was sent to my lawyer; right?
 9     Q  It's a letter from your lawyer to Equifax;
10  correct?
11     A  Yes.
12     Q  Have you seen that before?
13     A  No.
14     Q  All right.  The second page is an
15  authorization.
16        Do you remember filling out that authorization?
17     A  Yes, I remember.
18     Q  And was it filled out in 2004 or 2005?
19     A  2005.
20     Q  Okay.
21     A  Yes.
22     Q  And Equifax had sent the request for
23  information that we just looked at that you filled out
24  the day before this letter; correct?
25        MR. BOCHNER:  I am sorry.  I'm confused.
                                                  Page 344
```