1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 12/2/08**
**FOR PUBLICATION**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

NOEMIA CARVALHO, on behalf of herself and others similarly situated,

Plaintiff,

v.

EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; and TRANSUNION LLC,

Defendants.

Case Number C 08-1317 JF (HRL)

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT, DENYING MOTION TO CERTIFY CLASS, AND DENYING MOTION FOR LEAVE TO AMEND**

RE: Docket Nos. 72, 78, 95, 98, 101

        Plaintiff Noemia Carvalho ("Plaintiff") alleges that Equifax Credit Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and TransUnion LLC ("TransUnion") (collectively, "Defendants") violated her rights under the California Consumer Credit Reporting Agencies Act ("CCRAA"), which requires consumer credit reporting agencies to investigate disputed credit information and to cooperate with a consumer's investigation inquiries. Cal. Civ. Code § 1785.16. Plaintiff alleges that Defendants failed to conduct a reasonable reinvestigation of a disputed debt appearing on her credit report, and failed

adequately to apprise her of the reinvestigation procedures used.  Plaintiff now seeks to certify
two classes of similarly situated California consumers.  The first class comprises consumers
allegedly injured by credit report reinvestigation procedures that do not comply with § 1785.16
of the CCRAA.  The second class comprises consumers who allegedly did not receive an
adequate description of those procedures, as required by the statute.  Plaintiff seeks injunctive
relief and, alleging that Defendants knowingly and intentionally violated the CCRAA, an award
of punitive damages.  Defendants move for summary judgment on all claims and request that the
Court decide their potentially case-dispositive motions before addressing Plaintiff's motion for
class certification.[1]  Plaintiff moves the Court for leave to amend her complaint to add claims for
negligent violation of the CCRAA and its counterpart provisions in the federal Fair Credit
Reporting Act ("FCRA"), 15 U.S.C. § 1681i.  As set forth in detail below, Plaintiff is unable to
identify a factual inaccuracy on her credit report that Defendants could have discovered in
conducting any legally-mandated reinvestigation of the disputed debt.  Because such a showing
is essential to each of Plaintiff's claims, including those that Plaintiff seeks to add by
amendment, Defendants' motions for summary judgment will be granted.  Plaintiff's motion for
class certification will be denied as moot, and her motion for leave to amend the complaint will
be denied on the ground that amendment would be futile.

## I. FACTUAL BACKGROUND

On October 19, 2001, Plaintiff visited Bayside Hospital ("Bayside") seeking treatment
for knee pain.  Deposition of Noemia Carvalho, Vol. 1, Johnston Decl., Ex. A ("Pl. Depo. I"), at
35:19-22; Deposition of Noemia Carvalho, Vol. 2, Johnston Decl., Ex. B ("Pl. Depo. II"), at
372:3-11.  Upon her arrival, and before receiving any medical care, Plaintiff completed and
signed an Agreement with Bayside (the "Agreement") establishing her responsibility for
payment for any medical services rendered.  The Agreement included the following provision:

---

[1] "Where the defendant assumes the risk that summary judgment in his favor will have
only stare decisis effect on the members of the putative class, it is within the discretion of the
district court to rule on the summary judgment motion first." *Wright v. Schock*, 742 F.2d 541,
544 (9th Cir. 1984).

1
2
>  Bayside Medical Group, Inc., will bill your insurance as a courtesy to you.  If your insurance does not pay the claim within 90 days of the date of service, the balance of your account will be your responsibility.

3   Pl. Depo. I, Ex. C-3.  The Agreement also included the following clause: "Assignment and

4   Release:  I hereby authorize my insurance company to pay benefits directly to Bayside Medical

5   Group, Inc. and I am financially responsible for noncovered services."  *Id.*  Plaintiff has

6   acknowledged that she understood these statements and signed the Agreement.  Pl. Depo. I, at

7   35:9-18, 40:13-42:7.  After doing so, Plaintiff saw a physician who diagnosed her condition and

8   prescribed medication.  Pl. Depo. II, at 372:2, 372:13-24.  The treatment resulted in a charge of

9   $118.  *See* Pl. Depo. I, 51:1-8 & Ex. C-8.  The parties dispute whether at the time of the visit

10  Plaintiff was insured by Blue Cross or Blue Shield (or at all), and whether Bayside billed the

11  correct insurer (or any insurer).[2]  For the present purposes, it is sufficient to note that no insurer

12  had paid Plaintiff's bill within the ninety-day period prescribed by the Agreement.  Accordingly,

13  on January 15, 2002, Bayside sent Plaintiff a bill for the services she received.  Pl. Depo. I, Ex.

14  C-8.  The bill indicated that Plaintiff's insurer had declined coverage and that payment was due

15  to Bayside within fourteen days pursuant to the Agreement.

16   Plaintiff declined to pay the bill for approximately one year, at which point Bayside sent

17  Plaintiff a final billing notice on March 6, 2003.  Pl. Depo. I, Ex. C-10.  The notice indicated

18  that if Plaintiff did not make payment in full within seven days, Bayside would transfer the

19  account to a collection agency.  *Id.*  Plaintiff did not pay the bill, and Bayside assigned the debt

20  to Credit Consulting Services, Inc. ("CCS") for collection.  *Id.* 58:23-59:23.  On August 8, 2003,

21  CCS sent Plaintiff a collection notice stating that if Plaintiff "paid [the debt] in full . . . [,] all

22  collection activity [would] be stopped."  Frontino Decl., Ex. H.  The notice also stated that "[i]t

23  is the policy of [CCS] to report all eligible accounts to Experian, Equifax and TransUnion

24  Credit Reporting Services."  *Id.*  On September 15, 2003, CCS sent Plaintiff a letter with the

25

26   [2] Plaintiff has presented little credible evidence suggesting that Bayside billed the wrong
27  insurer or that Plaintiff was insured at all at the time of the Bayside visit.  However, as explained below, the resolution of these factual disputes would not affect the present disposition, and the
28  Court will assume for the sake of argument that Plaintiff's version of the facts is accurate.

3

1  reminder, in all capital letters, "IF PAYMENT IN FULL REACHES THIS OFFICE BY

2  10-8-03, THEN THIS COLLECTION ACCOUNT WILL NOT BE REPORTED ON YOUR

3  EXPERIAN, EQUIFAX, AND TRANSUNION CREDIT REPORTS.  PROTECT YOUR

4  CREDIT, SEND PAYMENT IN FULL."  Pl. Depo. I, Ex. C-15.  Plaintiff has acknowledged

5  that she received this notice but did not settle the debt.  *Id.* at 92:25-93:20.  On October 31,

6  2003, CCS sent Plaintiff a third warning letter stating: "YOU HAVE FAILED TO SEND US

7  PAYMENT.  YOU HAVE IGNORED OUR PREVIOUS DEMANDS.  UNLESS YOU

8  RESPOND TO THIS NOTICE IMMEDIATELY, EXPECT THE RESULTS OF YOUR OWN

9  NEGLECT.  PAYMENTS MUST BE MADE TO THIS OFFICE WITHOUT FURTHER

10  NOTICE."  Pl. Depo. I, Ex. C-18.  Plaintiff received this letter but did not pay the bill.  *Id.* at

11  96:9-18.  CCS reported the debt to Defendants, which added it to her credit report.  *See*

12  Complaint, ¶ 7.

13        Upon learning that the CCS debt appeared on her credit report, Plaintiff submitted four

14  letters to Defendants disputing the validity of the debt.  In her first letter of dispute, sent to

15  Defendants on September 10, 2004, Plaintiff asserted that the CCS item on her credit report was

16  inaccurate because Blue Cross should have paid the underlying debt to Bayside.  Pl. Depo. I, Ex.

17  16.  The letter was accompanied by sixteen pages of documentation, including (1) a benefits

18  page apparently from Plaintiff's employer identifying "Blue Cross PPO Plan" as her "Medical"

19  plan during her employer's 2001 benefit year, (2) copies of two insurance cards, one identifying

20  "Blue Cross/Blue Shield" and the other "Blue Cross of California" as her insurer, but neither

21  indicating a coverage year, (3) copies of correspondence Plaintiff claimed to have sent to Blue

22  Cross, but without responses from Blue Cross, (4) an Explanation of Benefits page Plaintiff

23  received from Blue Shield of California indicating that Plaintiff was not then covered by Blue

24  Shield of California, (5) copies of correspondence Plaintiff received from CCS and a credit

25  report reflecting the CCS item, and (6) a bill Plaintiff received from Bayside stating, in reference

26  to insurance coverage, "NOT ELIGIBLE AT THE TIME OF S[ERVICE] . . . . PLEASE CALL

27  YOUR INSURANCE."  *See* Bochner Decl. ISO Mot. to Certify Class, Ex. A.

28        Defendants began their reinvestigations on September 20, 2004.  *See* Johnston Decl., ¶

4

1    25, Ex. E; Fluellen Decl., ¶ 17; Terry Decl., ¶ 9.  Defendants determined that none of the

2    documentation submitted by Plaintiff met their documentation standards and did not consider it

3    further.[3]  Consistent with their standard procedures, Defendants recorded the dispute on a

4    Consumer Dispute Verification ("CDV") form, which typically contains a brief description and

5    code number characterizing the dispute, as well as the consumer's name, address, and social

6    security number, if available.  *See* Terry Decl., ¶ 5.[4]  Defendants each sent a CDV form to the

7    information furnisher, CCS.  *See* Terry Decl., ¶ 9; Johnston Decl., ¶ 25, Ex. E; Fluellen Decl., ¶

8    17.  CCS sent confirmation to Defendants that the disputed entry was "accurate," and

9    Defendants updated Plaintiff's file accordingly.  Terry Decl., ¶ 10; Fluellen Decl., ¶ 17.

10   Defendants also sent Plaintiff a notice summarizing the update to her file and further apprising

11   her of options for resolving the dispute.  *See* Pl. Depo I, Ex. 23; Fluellen Decl., ¶¶ 17-18; Terry

12   Decl. ¶ 11.

13        On April 1, 2005, Plaintiff sent a letter to Defendants requesting (1) a description of the

14   procedures used in reinvestigating the disputed item, and (2) inclusion of the following note in

15   Plaintiff's credit report: "I dispute the above Credit Consulting Services Acct. No. ***4329 on

16   my Credit Report.  These bills arose out of the medical treatment I was covered for by Blue

17   Cross of California.  For some reason that is unknown to me, they did not pay these medical

18   bills."  *See* Terry Decl., Ex. D.  Defendants responded to Plaintiff's request in several ways.

19   Equifax did not initiate a further reinvestigation because it did not appear that Plaintiff had

20   _____

21        [3] Defendants apparently have developed a set of guidelines designed to evaluate the
     authenticity and validity of documentation submitted by consumers in connection with disputed
22   items on their credit reports.  TransUnion, for example, only considers documents submitted by
     consumers valid when they are printed on the information furnisher's letterhead, contain the
23   information furnisher's contact information, and refer to the specific disputed account that can be
     matched to the consumer's file.  Terry Decl., ¶ 4.
24

25        [4] CDVs are transmitted to a credit reporting agency's information source, usually the
     creditor, with a request for verification and correction if necessary.  *See* Terry Decl., ¶ 5.  The
26   reporting agencies review responses to CDVs and make changes or deletions as appropriate.  *Id.*
     If the reporting agency receives no response to a CDV, the item is deleted.  *Id.*  After an
27   investigation is complete, the agency sends the results of the investigation to the consumer along
     with an updated credit report.  *Id.* ¶ 6.
28

1  requested one.  Fluellen Decl., ¶ 18.  Although it is unclear whether Equifax added Plaintiff's

2  statement of dispute to her credit file, *see* Fluellen Decl., ¶ 18, Equifax did send Plaintiff a

3  generic description of its reinvestigation procedures identical to one it already had sent Plaintiff

4  in connection with her first dispute.  *See id*.  TransUnion and Experian initiated further

5  reinvestigations of the disputed item using CDV forms and received confirmation from CCS

6  that the disputed item was accurate.  *See, e.g.*, Terry Decl., ¶¶ 12-13; Pl. Depo. I, at 134:24-

7  136:17 & Ex. 23.  TransUnion and Experian also updated Plaintiff's account to include her

8  statement of dispute, Terry Decl., ¶ 13; Pl. Depo. I 143:12-144:1 & Ex. 27, but neither agency

9  appears to have complied with Plaintiff's request for a description of the procedures used to

10  reinvestigate the dispute*, see* Pl.'s Opp. to Experian MSJ, at 5:3; Pl.'s Opp. to TransUnion MSJ,

11  at 7:6-7.

12       On June 3, 2005, Plaintiff lodged a further letter of dispute with Defendants, stating that

13  Plaintiff had "learned that the above referenced bill may have been paid if Credit Consulting

14  Service's Assignor Bayside Medical Group had timely and properly submitted my bill to Blue

15  Shield.  I therefore renew my dispute on this basis."  *See* Terry Decl., Ex. F.  Plaintiff provided

16  no accompanying documentation in connection with this communication, but she again

17  requested a description of Defendants' reinvestigation procedures.  *Id.*  TransUnion, which

18  already had initiated a second reinvestigation of Plaintiff's dispute without evidence of any

19  changed factual circumstances, viewed the request as "frivolous" within the meaning of § 1681i

20  and § 1785.16 and informed Plaintiff that it would not initiate a further investigation.  Terry

21  Decl., ¶¶ 14-15 & Ex. G.  Equifax did initiate a further investigation and sent a CDV form to

22  CCS.  When CCS again verified the accuracy of the debt, Equifax updated Plaintiff's file and

23  provided a notice to Plaintiff that summarized the results of the reinvestigation and informed

24  Plaintiff that she could request a description of the reinvestigation procedures.  Experian claims

25  to have followed a similar course in addressing Plaintiff's June 2005 request.  *See* Experian

26  MSJ, at 7:17-8:2.

27       On February 9, 2006, Plaintiff's counsel sent Defendants a letter again explaining that

28  Plaintiff considered the CCS entry inaccurate because Bayside had not billed her actual insurer

6

1   pursuant to the Agreement, and requesting that Defendants reinvestigate the dispute. *See* Terry

2   Decl., Ex. H.  Defendants initiated a further investigation by CDV form, and CCS once again

3   confirmed that the disputed entry was accurate.  Defendants once again updated Plaintiff's file

4   and notified her of the results of the reinvestigation.  Terry Decl., ¶¶ 16-17; Fluellen Decl., ¶ 20;

5   Experian MSJ, at 7:17-8:2.[5]  Plaintiff thereafter filed the instant action.[6]

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

7        Summary judgment is appropriate when there are no genuine and disputed issues of

8   material fact and the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56;

9   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The Court must view the evidence in the

10  light most favorably to the non-moving party, and all reasonable inferences must be drawn in

11  favor of that party.  *Torres v. City of Los Angeles*, 540 F.3d 1031, 1039-40 (9th Cir. 2008).  The

12  moving party bears the burden of showing that there is no material factual dispute.  Therefore,

13  the court must regard as true the opposing party's evidence, if supported by affidavits or other

14  evidentiary material. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

### A.   Dispute reinvestigation claims pursuant to Cal. Civ. Code §§ 1785.16(a) & (b)

17       Plaintiff's case turns largely on two provisions of the CCRAA, Cal. Civ. Code §§

18  1785.16(a) and 1785.16(b), which set forth procedures governing a credit reporting agency's

19  duty to reinvestigate consumer disputes.  Section 1785.16(a) provides that if a consumer

20  disputes the accuracy of

21       any item of information contained in his or her file . . . , and the dispute is
         conveyed directly to the consumer credit reporting agency . . . , the consumer
22       credit reporting agency shall . . . reinvestigate and record the current status of the
         disputed information before the end of the 30-business-day period beginning on

---

24       [5] Each defendant removed the disputed entry from Plaintiff's file at some time between

25  July 2007 and August 2008, purportedly pursuant either to legal requirements or internal

26  protocols.  *See* Defs.' Opp. to Mot. to Shorten Time, Doc. No. 92, at 2:23-3:3.

27       [6] The action initially was filed on November 20, 2006 in the Monterey Superior Court.

28  Equifax removed the case to this Court on March 7, 2008.  On April 7, 2008, Plaintiff filed a
    motion to remand, which was denied.

Case No. C 08-1317 JF (HRL)
ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT, ETC.
(JFLC3)

1   the date the agency receives notice of the dispute from the consumer or user,
2   unless the consumer credit reporting agency has reasonable grounds to believe
    and determines that the dispute by the consumer is frivolous or irrelevant,
3   including by reason of a failure of the consumer to provide sufficient information
    . . . to investigate the dispute. Unless the consumer credit reporting agency
4   determines that the dispute is frivolous or irrelevant, before the end of the
    five-business-day period beginning on the date the consumer credit reporting
5   agency receives notice of dispute under this section, the agency shall notify any
    person who provided information in dispute at the address and in the manner
6   specified by the person.

Section 1785.16(b) requires that

[i]n conducting that reinvestigation[,] the consumer credit reporting agency shall
review and consider all relevant information submitted by the consumer with
respect to the disputed item of information. If the consumer credit reporting
agency determines that the dispute is frivolous or irrelevant, it shall notify the
consumer . . . within five business days after that determination is made that it is
terminating its reinvestigation of the item of information. In this notification, the
consumer credit reporting agency shall state the specific reasons why it has
determined that the consumer's dispute is frivolous or irrelevant. If the disputed
item of information is found to be inaccurate, missing, or can no longer be
verified by the evidence submitted, the consumer credit reporting agency shall
promptly add, correct, or delete that information from the consumer's file.

Plaintiff claims that Defendants (1) violated § 1785.16(a) by failing to notify her of the

status of her credit disputes within the statutory time period, and (2) violated § 1785.16(b) by

failing to conduct an adequate reinvestigation.  Both provisions are based on the federal Fair

Credit Reporting Act, which imposes substantially the same requirements.  *Compare* 15 U.S.C.

§ 1681i(a)(1)(A) (requiring credit reporting agencies to conduct reinvestigations of disputed

credit report items within 30 days of consumer lodging dispute) *with* Cal. Civ. Code §

1785.16(a) (same); *compare* 15 U.S.C. §1681i(a)(3)-(4) (concerning determinations of frivolous

disputes and credit reporting agencies' duties to consider information submitted by consumers)

*with* Cal. Civ. Code. § 1785.16(b) (same).  California courts treat decisions interpreting the

federal reinvestigation provision, 15 U.S.C. § 1681i, as persuasive authority.  *See, e.g.*, *Olson v.

Six Rivers Nat'l Bank*, 111 Cal. App. 4th 1, 12 (2003).  Indeed, given the paucity of case law

discussing the California reinvestigation provisions, cases interpreting § 1681i are the primary

source of authority with respect to both the federal and California reinvestigation requirements.

A prima facie showing under § 1681i consists of the following elements: (1) plaintiff's

credit file contains inaccurate or incomplete information; (2) plaintiff notified the credit

8

1   reporting agency directly of the inaccurate or incomplete information; (3) plaintiff's dispute is

2   not frivolous or irrelevant; (4) the credit reporting agency failed to respond to plaintiff's dispute;

3   (5) the failure to reinvestigate caused plaintiff to suffer damages; (6) actual damages, such as

4   damages caused by humiliation, mental distress, or injury to reputation or creditworthiness,

5   resulted to plaintiff.  *See, e.g.*, *Thomas v. TransUnion LLC*, 197 F. Supp. 2d 1233, 1236 (D. Or.

6   2002).  Defendants claim that all of Plaintiff's reinvestigation claims are barred because the

7   credit entry giving rise to Plaintiff's four substantially identical disputes was accurate.  Plaintiff

8   claims that the disputed entry was inaccurate, but she also contends that she is entitled to an

9   adjudication of the adequacy of Defendants' procedures irrespective of whether the entry was

10  accurate.

11          While neither the FCRA nor the CCRAA requires on its face that a disputed credit entry

12  contain inaccurate information, a majority of courts interpreting § 1681i have adopted such a

13  requirement in light of the FCRA's purpose, which is to protect consumers against the

14  compilation and dissemination of *inaccurate* credit information.  *See DeAndrade v. Trans Union*

15  *LLC*, 523 F.3d 61, 67-68 (1st Cir. 2008) (citing legislative history of FCRA and noting

16  agreement of Ninth and Seventh Circuits that a showing of inaccuracy is required to state a

17  claim under § 1681i); *see also Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 (9th Cir. 2008)

18  (endorsing rule that "§ 1681i creates no duty to reinvestigate where 'the credit report accurately

19  reflect[s] the status of the information contained in the public records'") (quoting *Williams v.*

20  *Colonial Bank*, 826 F. Supp. 415, 418 (M.D. Ala. 1993)).  Accordingly, "if there is no genuine

21  issue as to whether the . . . debt reported by [the reporting agencies] was inaccurate, [the

22  plaintiff's] claim fails as a matter of law."  *DeAndrade v. Trans Union LLC*, 523 F.3d at 68.[7]

23

24          [7] Plaintiff criticizes the Ninth Circuit's endorsement of an inaccuracy requirement in
    *Dennis* and argues that two unpublished district court decisions from Alabama are "better
25  reasoned."  *See, e.g.*, Pl.'s Opp. to Experian MSJ, at 15:18-16:21 (attacking *Dennis* and citing
    *Abbet v. Bank of America*, No. 3:04CV 01102 WKW, 2006 WL 581193 (M.D. Ala. Mar. 8,
26  2006) and  *Lofton-Taylor v. Verizon*, No. 05-0532-CG-B, 2006 WL 3333759 (S.D. Ala. Nov. 14,
    2006) for the proposition that reinvestigation claims may proceed regardless of whether the
27  disputed information later is determined to be accurate).  Plaintiff's contentions lack merit for
    several reasons.  First, this Court obviously must follow the law as articulated by the Ninth
28

9

1    The First Circuit has explained that "[t]o determine whether a consumer has identified a

2    factual inaccuracy on his or her credit report that would activate § 1681i's reinvestigation

3    requirement, the decisive inquiry is *whether the defendant credit bureau could have uncovered*

4    *the inaccuracy if it had reasonably reinvestigated the matter*." *Id.* at 68 (emphasis added)

5    (citing *Cushman v. Trans Union Corp*, 115 F.3d 220, 226 (3d Cir. 1997) (quotation marks

6    omitted)).  In *DeAndrade*, plaintiff DeAndrade purchased new windows for his home using

7    mortgage financing arranged by the seller of the windows.  *Id.* at 63.  When DeAndrade and his

8    wife obtained and reviewed the mortgage documents, they were "shocked" to find that the

9    documents granted a mortgage on their residence, and that their signatures on the documents

10   appeared to have been forged.  *Id.*  DeAndrade stopped payment on the mortgage, causing the

11   mortgagee Bank to notify TransUnion, Experian, and Equifax of the delinquency.  *Id.* at 64.

12   DeAndrade sent a reinvestigation request and forty-nine pages of supporting documents to the

13   reporting agencies, claiming that the mortgage had been obtained fraudulently.  *Id.*  TransUnion

14   sent a CDV notice to the bank but declined to transmit any of the supporting documentation

15   provided by the DeAndrades.  *Id.*  The Bank responded that the information was accurate, and

16   TransUnion notified DeAndrade of the results of its reinvestigation.  *Id.*  In holding that

17   DeAndrade had not made the prima facie showing of inaccuracy required to state a claim under

18   § 1681i, the court concluded that DeAndrade in reality was attacking the validity of the

19   mortgage, and that "[w]hether the mortgage is valid turns on questions that can only be resolved

20   by a court of law, such as whether DeAndrade ratified the loan." *Id*. at 68.  This was "not a

21   factual inaccuracy that could have been uncovered by a reasonable reinvestigation, but rather a

22

_____

23   Circuit.  Second, the two cases cited by Plaintiff deal with provisions of the FCRA that apply
     exclusively to *furnishers* of credit information and thus are inapposite in the present context.
24   Finally, although the facts of *Dennis* allowed the Ninth Circuit merely to note the existence of an
     inaccuracy requirement without further elaboration, the First Circuit has articulated a convincing
25   rationale for the requirement–a rationale with which this Court has no reason to disagree.  *See*
     *DeAndrade*, 523 F.3d at 67-68 (noting that Congress's purpose in passing the FCRA was to
26   prevent the transmission of *inaccurate* information by credit reporting agencies, and that a
     plaintiff at the very least would be unable to show damages absent a factual inaccuracy in his or
27   her credit report).

28

10

1    legal issue that a credit agency such as TransUnion is neither qualified nor obligated to resolve

2    under the FCRA." *Id.* at 68.

3        As will become clear, Plaintiff's dispute in the instant case ultimately turns on the legal

4    question of whether the Agreement makes her liable for the hospital debt, notwithstanding an

5    alleged breach of the Agreement by Bayside.  There is no dispute that (1) Plaintiff received

6    medical treatment at Bayside Hospital on October 19, 2001, (2) before receiving such treatment,

7    she completed and duly executed an agreement with Bayside whereby Bayside would bill

8    Plaintiff's insurance as a courtesy, and whereby Plaintiff in any event was "responsible for

9    noncovered services," Pl. Depo. I, Ex. C-3, (3) Plaintiff's treatment resulted in a bill for $118,

10   (4) no insurer agreed to cover the bill, (5) Bayside sent Plaintiff a final bill for $118, (6) Plaintiff

11   did not pay the bill, (7) Bayside forwarded the debt to CCS, which sent multiple collection

12   notices and warnings of impending transmission to Defendants, (8) Plaintiff did not respond to

13   the CCS notices, and (9) CCS informed Defendants of Plaintiff's delinquency, causing the

14   disputed item to appear on Plaintiff's credit report.[8]  Clearly, if Bayside had accepted

15   responsibility for the debt because it billed the wrong insurer, the disputed entry on Plaintiff's

16   credit report would have been factually inaccurate in the sense required to state a claim under §

17   1681i.  *See DeAndrade*, 523 F.3d at 68 (noting that "[i]f a court had ruled the mortgage invalid

18   and TransUnion had continued to report it as a valid debt, *then* DeAndrade would have grounds

19   for a potential FCRA claim" (emphasis in original)).  Plaintiff, however, has offered no evidence

20   suggesting that this is the case.  Indeed, despite Plaintiff's efforts to resolve the debt with

21   Bayside and Bayside's purported acknowledgment that it billed the wrong insurer, Bayside

22   "continued to allow CCS to collect and ultimately credit report [sic] the account."  Bochner

23

24        [8] As an initial matter, the Court rejects Defendants' reliance on Plaintiffs' purported
25   admission that the entry was accurate.  In her deposition, Plaintiff at various times confirmed the
     series of events noted above and stated that the adverse credit entry, as reported by CCS, was
26   "accurate."  It is clear, however, that Plaintiff was referring only to the fact that CSS accurately
     had reported the debt identified by Bayside to Defendants.  Plaintiff's contention that the entry
27   was inaccurate turns on whether the initial debt, as reported by Bayside, accurately reflected her
28   obligations.

                                                11

1 │ Decl. ISO Opp. to Experian's MSJ, at 3:23-26.

2 │      Absent some evidence that Bayside revised its determination with respect to Plaintiff's

3 │ liability for the debt, the ultimate issue is whether Plaintiff *legally* was bound to pay the debt in

4 │ light of Bayside's alleged failure to bill the correct insurer.  That issue turns on a legal

5 │ construction of the Agreement between Plaintiff and Bayside.  Hypothetically, a court

6 │ construing the Agreement could conclude that Plaintiff became personally liable for the hospital

7 │ bill as soon as the contractual ninety-day period expired without any insurer having paid the

8 │ debt.  However, a court also could conclude that Plaintiff assumed no contractual responsibility

9 │ for the bill until Bayside timely billed Plaintiff's actual insurer.  Whatever the outcome, the

10 │ proper construction of the Agreement presents "a legal issue that a credit agency . . . is neither

11 │ qualified nor obligated to resolve."  *DeAndrade*, 523 F.3d at 68.[9]  Because her actual dispute is

12 │ with Bayside, Plaintiff "has crossed the line between alleging a factual deficiency that

13 │ [Defendants were] obliged to investigate pursuant to the FCRA and launching an impermissible

14 │ collateral attack against" Plaintiff's apparent contractual liability for the hospital bill.  *Id.*; *see*

15 │ *also Wadley v. Equifax Information Services, LLC*, 396 F. Supp. 2d 677, 679-80 (E.D. Va. 2005)

16 │ ("The FCRA does not provide a cause of action to collaterally attack an accurate credit report.");

17 │ *Williams v. Colonial Bank*, 826 F. Supp. 415, 418 (M.D. Ala. 1993) ("A credit reporting agency

18 │ has no duty, as a part of its reinvestigation, to go behind public records to check for accuracy or

19 │ completeness when a consumer is essentially collaterally attacking the underlying credit

20 │ information.").

21 │      Cases frequently may arise in which a consumer legitimately disputes a debt whose

22 │ validity cannot be determined by a credit reporting agency.  While a reporting agency legally

23 │ may report the credit-relevant fact that a consumer has outstanding debts subject to collection, §

24 │ 1681i(c) of the FCRA and § 1785.16(d)(5) of the CCRAA provide a remedy for consumers,

25 │ allowing them to record their version of the dispute in their credit report.  *See, e.g.*, *DeAndrade*,

26 │

27 │ _____

28 │     [9] Indeed, at oral argument, Plaintiff's counsel reduced the purported inaccuracy of the debt to the alleged fact that "Bayside breached the contract."

1    523 F.3d at 69 (noting that in cases in which the dispute actually is with the furnisher of credit

2    information, the appropriate remedy is to file a note reflecting the dispute for inclusion in the

3    credit report pursuant to § 1681i(c)); *Williams*, 826 F. Supp. at 418 (same) (citing *Cahlin v.*

4    *General Motors Acceptance Corp.*, 936 F.2d 1151, 1160 n.23 (11th Cir. 1991)).  Although it is

5    immaterial to the question of whether Plaintiff in the instant case has stated a claim under §

6    1681i, the record reflects that Plaintiff did avail herself of the statutory remedy.  *See* Terry Decl.,

7    Ex. D (letter from Plaintiff to Defendants requesting that statement of dispute be placed in

8    Plaintiff's credit file).[10]

9    **B.    Description-of-procedures claims pursuant to Cal. Civ. Code § 1785.16(d)(4)**

10         Plaintiff also alleges that Defendants failed to provide her an adequate description of the

11   procedures they used to determine the accuracy of the disputed entry on her credit report,

12

13   [10] Because Plaintiff has failed to identify any factual inaccuracy that Defendants might
14   have discovered by conducting a reasonable investigation, the Court will not address the issue of
     whether it was reasonable for Defendants to rely exclusively on the furnisher of the credit
15   information (CCS) in verifying the validity of the debt, or to withhold all of the documentation
     provided by Plaintiff in connection with the dispute.  However, the Court notes that while there is
16   no categorical rule requiring reporting agencies to look beyond the furnishers of credit
     information in conducting a reinvestigation, the agencies also are not entitled *as a matter of law*
17   to rely on such furnishers using the CDV system.  *See, e.g.*, *Cushman v. TransUnion Corp.*, 115
18   F.3d 220, 225 (3d Cir. 1997) (denying defendant's motion for summary judgment in claim for
     failure to reinvestigate where it merely verified negative information with credit furnishers
19   despite consumer's warning that information was inaccurate); *Henson v. CCS Credit Servs.*, 29
     F.3d 280, 286-87 (7th Cir. 1994) (rejecting argument that reporting agencies have no duty to go
20   beyond the furnisher of information in verifying credit entries); *Stevenson v. TRW Inc.*, 987 F.2d
21   288, 293 (5th Cir. 1993) (rejecting argument that mere verification with furnisher necessarily is
     adequate, and noting that "[i]n a reinvestigation of the accuracy of credit reports, a credit bureau
22   must bear some responsibility for evaluating the accuracy of information obtained from
     subscribers"); *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) (denying defendant's
23   motion for new trial for failure to reinvestigate where consumer informed reporting agency of his
24   personal dispute with credit grantor, yet reporting agency relied solely on credit grantor for
     information during investigation), *cert. denied*, 483 U.S. 1022 (1987).  Rather, as the Seventh
25   Circuit stated in its influential *Henson* decision, "whether the credit reporting agency has a duty
26   to go beyond the original source will depend, in part, on whether the consumer has alerted the
     reporting agency to the possibility that the source may be unreliable or the reporting agency itself
27   knows or should know that the source is unreliable[,] . . . . [and] on the cost of verifying the
     accuracy of the source versus the possible harm inaccurately reported information may cause the
28   consumer."  *Henson*, 29 F.3d at 287.

13

1    sending her mere "boilerplate" descriptions that do not satisfy the requirements of §

2    1785.16(d)(4) of the CCRAA.  Section 1785.16(d)(4) states that

3            [a] consumer credit reporting agency shall provide written notice to the consumer
            of the results of any reinvestigation under this subdivision, . . . . [including] a
4            notice that, if requested by the consumer, a description of the procedure used to
            determine the accuracy and completeness of the information shall be provided to
5            the consumer by the consumer credit reporting agency, including the name,
            business address, and telephone number of any furnisher of information contacted
6            in connection with that information.

7    No court has addressed explicitly the substantive requirements of § 1785.16(d)(4) or its federal

8    counterpart, § 1681i(a)(6)(B)(iii) & (a)(7).

9            The threshold issue facing this Court is whether Plaintiff may bring a § 1785.16(d)(4)

10   claim notwithstanding the failure of her underlying reinvestigation claim.  There are reasons for

11   and against permitting an independent claim under § 1785.16(d)(4).  In one respect, the

12   inaccuracy requirement under § 1681i (and hence under its California counterpart, §

13   1785.16(d)(4)) appears to be purely a judicial screening device.  A consumer cannot be required

14   to demonstrate the existence of an inaccuracy in his or her credit report in order to trigger a

15   reinvestigation in the first instance.  This is because a reporting agency has only one permissible

16   option to avoid reinvestigating a dispute, that is, a determination that the dispute is frivolous or

17   irrelevant.  *See* 15 U.S.C. § 1681i (a)(1)(A) & (3)(A) ("the agency *shall* . . . conduct a

18   reasonable reinvestigation" except upon determining that the dispute is frivolous or irrelevant)

19   (emphasis added); Cal. Civ. Code § 1785.16(a) ("the consumer credit reporting agency *shall* . . .

20   reinvestigate and record the current status of the disputed information . . . *unless* the consumer

21   credit reporting agency has reasonable grounds to believe and determines that the dispute by the

22   consumer is frivolous or irrelevant") (emphasis added).  Courts, however, may fashion rules to

23   screen out reinvestigation claims that appear, with the benefit of hindsight and a developed

24   record, to be beyond the protection of the relevant statutes.  One such rule is that a disputed

25   credit item must have been factually inaccurate, since claims stemming from *accurate* items (1)

26   would not further the statutory purpose of preventing the transmission of *inaccurate*

27   information, and (2) would be futile given the impossibility of proving damages.  *See*

28   *DeAndrade*, 523 F.3d at 67-68 (discussing dual rationales for the inaccuracy requirement).  This

14

1   understanding of the inaccuracy requirement might suggest that claims under § 1785.16(d)(4)

2   should be treated as independent of reinvestigation claims, since the FCRA and CCRAA require

3   a reinvestigation even in cases in which the disputed item turns out to be accurate.

4       Nonetheless, the rationale for imposing an inaccuracy requirement on reinvestigation

5   claims favors applying that requirement to claims under § 1681i(a)(6)(B)(iii) and its California

6   counterpart, § 1785.16(d)(4).  Those provisions are tied to the underlying reinvestigation

7   requirements, and a plaintiff who cannot state a claim for inadequate reinvestigation procedures

8   logically cannot state a claim for failure to provide notice of alleged defects in those procedures.

9   Indeed, the only court to have addressed substantively either the federal or California

10  requirements with respect to descriptions of reinvestigation procedures held that where the

11  disputed entry was accurate, a description of the reporting agencies' reinvestigation procedures,

12  no matter how thorough or detailed, would not have served any purpose.  *See Jianqing Wu v.*

13  *Trans Union*, Civ. No. AW-03-1290, 2006 WL 4729755, at *11 (D. Md. May 2, 2006) ("Given

14  that . . . the entries . . .were not inaccurate, the failure of Defendant to provide Plaintiff with

15  details about its reinvestigation certainly did not serve as the 'but for cause to all damages'

16  suffered by Plaintiff.  Because Plaintiff cannot demonstrate that Equifax's failure to disclose its

17  reinvestigation caused him to sustain actual injuries, this Court concludes that Plaintiff cannot

18  prevail in his suit for negligent non-compliance with 15 U.S.C. § 1681i(a)(7)."); *see also*

19  *DeAndrade*, 523 F.3d at 67 (suggesting categorically that "without a showing that the reported

20  information was in fact inaccurate, a claim *brought under § 1681i* must fail" (emphasis added)).

21  In the instant case, as in *Jianqing Wu*, the disputed item underlying Plaintiff's § 1785.16(d)(4)

22  claim was accurate, and to entertain that claim would be as inconsistent with the statutes'

23  purposes as it would be futile.

24                              **IV. CONCLUSION**

25      Because there is no genuine dispute that Plaintiff's credit report was factually accurate,

26  Defendants are entitled to judgment as a matter of law and their motions for summary judgment

27  will be granted.  Plaintiff's motion for class certification will be denied as moot.  Because the

28  claims Plaintiff proposes to add by amending her complaint are subject to the same inaccuracy

                                        15

1    requirement that bars the claims now before the Court, her motion for leave to amend will be

2    denied on the ground that amendment would be futile.[11]

3

4    **IT IS SO ORDERED.**

5

6    DATED: 12/2/08

7

8    _____
     JEREMY FOGEL
     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20       [11] In assessing whether Plaintiff should be given leave to amend, the Court ordinarily

21    must consider "the presence or absence of undue delay, bad faith, dilatory motive, repeated
     failure to cure deficiencies by previous amendments, undue prejudice to the opposing party[,]

22    and futility of the proposed amendment." *Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052
     (9th Cir. 2001) (quoting *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir.

23    1989)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (providing factors constraining
     district court's discretion to deny leave to amend).  These factors, however, are "not given equal

24    weight . . . , [and] futility of amendment can, by itself, justify the denial of a motion for leave to
     amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).  While there is no evidence that

25    Plaintiff has been guilty of undue delay, bad faith, or dilatory motive, Plaintiff's claims clearly
     are foreclosed by the inaccuracy requirement of § 1681i and § 1785.16.  Both the futility of

26    amendment and consideration of the substantial prejudice that Defendants would
     suffer–particularly given the number of similar claims with which they must contend–warrant

27    denial of leave to amend.

28

Case No. C 08-1317 JF (HRL)
ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT, ETC.
(JFLC3)

1 | This Order has been served upon the following persons:

2 | Barry Goheen bgoheen@kslaw.com, Equifaxecf@kslaw.com

3 | Brian C. Frontino bfrontino@stroock.com, lacalendar@stroock.com

4 | Darius K.C. Zolnor dzolnor@stroock.com

5 | Deanna L. Johnston dljohnston@jonesday.com, kdorse@jonesday.com, pwalter@jonesday.com

6 | Kelli A. Crouch kcrouch@jonesday.com, lfrancegorn@jonesday.com

7 | Lewis P. Perling lperling@kslaw.com, Ecfequifax@kslaw.com

8 | Ron Keith Bochner robolaw@justice.com

9 | Stephen Julian Newman SNEWMAN@STROOCK.COM, lacalendar@stroock.com,

10 | rharcourt@stroock.com, snewman8@yahoo.com

11 | Suzanne Cate Jones scjones@jonesday.com, iramirez@jonesday.com

12 | Thomas P. Quinn yhoman@nokesquinn.com, tquinn@nokesquinn.com

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

17